UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DENNIS LOUIS RUELLO, ET AL. | CIVIL ACTION |
| VERSUS | NO. 20-895 |
| JPMORGAN CHASE BANK, N.A., ET AL. | SECTION "R" (1) |

## ORDER AND REASONS

Before the Court is defendant and third-party plaintiff JP Morgan Chase Bank, N.A.'s ("Chase") motion for summary judgment on its third-party claim against SMS Assist, LLC ("SMS"), seeking indemnification for costs arising out of plaintiff's claim.[1] SMS opposes the motion.[2] Because Chase has not established that the indemnification provision applies to plaintiff's claim, the Court denies Chase's motion.

### I. BACKGROUND

This case arises from a fall that occurred at a branch location of Chase Bank in Metairie, Louisiana.[3] Plaintiff Dennis Ruello alleges that, on May

---

1      R. Doc. 46.
2      R. Doc. 53.
3      R. Doc. 1-2.

21, 2018, while walking on a sidewalk outside of defendant's bank, he tripped on a sprinkler head and fell to the ground, sustaining injuries.[4] Plaintiff alleges that the sprinkler head's proximity to the sidewalk was a dangerous and hazardous condition.[5]

On May 21, 2019, plaintiff filed suit in Louisiana state court, alleging that defendant's negligence caused his injuries.[6] On March 13, 2020, defendant Chase removed the case to federal court, contending that the requirements of diversity jurisdiction under 28 U.S.C. § 1332 are met.[7]

On July 29, 2020, Chase filed a third-party complaint against SMS.[8] In its complaint, Chase represents that it entered into a contract with CBRE, Inc. ("CBRE") to perform certain services on the premises of the bank's Metairie branch.[9] The record indicates that CBRE, in turn, entered into a contract with SMS to perform those services.[10] Chase alleges that the contract between CBRE and SMS requires SMS to indemnify and defend Chase for costs incurred in this litigation.[11]

---

4   *Id.* ¶¶ IV-V.
5   *Id.* ¶ V.
6   *Id.* at 1.
7   R. Doc. 1.
8   R. Doc. 23.
9   *Id.* ¶ IV.
10  *Id.* ¶ V; R. Doc. 55-2 at 7.
11  R. Doc. 23 ¶ VII.

2

The contract between CBRE and SMS contains an indemnification clause, which provides that:

> To the fullest extent permitted by law, [SMS] shall defend (with counsel reasonably acceptable to Owner and/or CBRE), indemnify, pay, save and hold harmless the Indemnified Parties from and against any liabilities, damages (including, without limitation, direct, special and consequential damages), costs, expenses, suits, losses, claims, actions, fines and penalties (including, without limitation, court costs, reasonable attorneys' fees and any other reasonable costs of litigation) (hereinafter collectively, the "Claims") that any of the Indemnified Parties may suffer, sustain or incur arising out of or in connection with:
>
> 1. [SMS's] work on the Facilities or other work site, including but not limited to any negligent acts, errors or omissions, intentional misconduct or fraud of [SMS], its employees, subcontractors or agents, whether active or passive, actual or alleged, whether in the provision of the Services, failure to provide any or all of the Services, or otherwise . . . .[12]

The contract defines SMS's "Services" as those "described in Exhibits 1-A through 1-C . . . and in individual work orders, if any, issued by CBRE in writing."[13] Exhibit 1-B of the contract pertains to landscaping and grounds services,[14] including irrigation. The services related to irrigation are:

---

[12]  R. Doc. 55-2 at 17.
[13]  *Id.* at 33.
[14]  *See id.* at 39.

3

Irrigation Start Up

1. In accordance with the Periodic Calendar, [SMS] will visually inspect irrigation system and make any necessary adjustments to deliver adequate soil moisture.
2. Identify all malfunctions of the system and report repair cost to CBRE.
3. Manual operation of the entire system shall be performed [to] verify proper operation of all system components, check each zone for evidence of water loss during operation, adjust and clean all heads and valves as needed for proper function and efficiency.
4. Replace battery back-up in controller as needed. Complete any required irrigation programming and/or settings changes necessary to ensure proper coverage and efficient operation of the system.
5. Notify corporate CBRE if system is not fully operational at completion of start-up or if there any conditions present that may affect proper operation.[15]

Irrigation Shut Down

1. In accordance with the Periodic Calendar, [SMS] will ensure proper winterization of all irrigation system components prior to freezing conditions in the local area in order to prevent damage.
2. Evacuate standing water from all system piping and other components.
3. Any conditions or damage discovered during fall shut down that will prevent proper winterization are to be reported immediately.
4. Verify that all irrigation controls have been disabled, exposed elements protected as appropriate, and unplug the controller.[16]

---

[15]   *Id.* at 58.
[16]   *Id.* at 59.

Irrigation Audit

1. In accordance with the Periodic Calendar, [SMS] will visually inspect the watering patterns of the irrigation system as requested to ascertain whether the system is functioning properly.
2. At this time, [SMS] will adjust the system to proper time of operation according to local ordinances and proper watering patterns (will require CBRE coordination with any 3rd party irrigation service provider as applicable).
3. Manually run and inspect the system to adjust seasonal water output, verify proper operation of all components, clean and adjust all heads, trim plant materials that obstruct spray patterns, and report any broken or damaged heads, connecting pipes or other components to operations manager.[17]

. . .

Irrigation Repairs

1. Routine maintenance and repairs of any existing irrigation system.
2. Any repairs due to [SMS's] failure to perform or damage caused in the course of [SMS] performing contracted work.
3. Repair for damage caused by non-[SMS] vendors or vehicles is considered an Additional Landscape Service.[18]

Separately, Exhibit 1-B indicates that SMS may provide "Additional Landscape Services," which are "not included as part of the Core Services."[19] SMS provides these services "upon CBRE's request (as reflected in one or

---

[17]   *Id.*
[18]   *Id.* at 64.
[19]   *Id.* at 65.

5

more separate Work Orders) and [SMS's] acceptance thereof."[20] Those services include the following items related to irrigation:

<u>Irrigation Upgrades / Enhancements</u>

1. Equipment upgrades, additional features or additions of coverage areas
2. Irrigation system conversions or modifications
3. New system installations[21]

Chase now moves for summary judgment on its third-party indemnity claim against SMS, arguing that the indemnification provision in the contract between CBRE and SMS covers plaintiff's allegations.[22] SMS argues that it is not required to indemnify Chase because the indemnification provision does not cover the issue underlying plaintiff's complaint.[23] Specifically, SMS argues that its lawncare services did not include placement of sprinkler heads, the condition that allegedly caused plaintiff's injuries.[24] The Court considers the parties' arguments below.

---

[20] *Id.*
[21] *Id.* at 67.
[22] R. Doc. 46-1 at 6.
[23] R. Doc. 55 at 6.
[24] *Id.*

6

## II. LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)). "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion,

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

## III. DISCUSSION

As an initial matter, the Court notes that Chase based its motion for summary judgment on a contract between CBRE and SMS, executed in 2014.[25] But the record indicates that the 2014 contract is not the operative agreement. SMS submitted authenticated evidence indicating that the contract was amended in 2017.[26] Chase did not submit a reply in support of its motion, nor has it otherwise contested that the 2017 contract is the operative agreement. Because plaintiff's accident and claims postdate the 2017 amendment, the contract cited by Chase was no longer in effect at the times relevant to this dispute. Accordingly, the ensuing analysis looks to the amended contract, not the 2014 contract submitted by Chase.[27]

---

[25] *See* R. Doc. 46-3 at 10.
[26] R. Doc. 55-2 at 33 ("THIS AMENDMENT . . . dated effective as of October 20, 2017 . . . is entered into by and between CBRE, INC. . . . and SMS ASSIST, L.L.C., . . . for the purpose of amending that Service Agreement dated July 1, 2014 between [SMS] and CBRE . . . .").
[27] Chase supports its submission of the obsolete contract with an affidavit by Lynda Kabalin, the Direct of Compliance for CBRE on the Chase account. *See* R. Doc. 46-3 at 7. The affidavit is not reliable. First, the affiant admits to having no personal knowledge of plaintiff's accident,

9

Having determined which is the proper contract, the Court must decide which law to apply to the dispute. Federal courts sitting in diversity apply the choice-of-law rules of the forum state. *Ellis v. Trustmark Builders, Inc.*, 625 F.3d 222, 225 (5th Cir. 2010). Under Louisiana law, contractual choice-of-law provisions generally must be given effect. *See* La. Civ. Code art. 3540 ("All . . . issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable . . . ."); *see also Delhomme Indus., Inc., v. Hous. Beechcraft, Inc.*, 669 F.2d 1049, 1058 (5th Cir. 1982) ("[W]here the parties stipulate the State law governing the contract, . . . the stipulation [must] be given effect, unless there is statutory or jurisprudential law to the contrary or strong public policy considerations justifying the refusal to honor the contract as written." (quoting *Assoc. Press v. Toledo Invs., Inc.*, 389 So. 2d 752, 754 (La. App. 3

---

and bases her testimony and identification of the relevant contract only on information and belief. *Id.* ¶ 5. Second, the affiant identifies the wrong contract, as the contract was amended substantially in 2017. *Id.* Finally, the affiant mischaracterizes plaintiff's claim, testifying that she understands that he "claims to have tripped and fallen on an allegedly *malfunctioning sprinkler* in the grass outside the building. *Id.* ¶ 3 (emphasis added). Nowhere in plaintiff's complaint does he allege that the sprinkler was malfunctioning. His allegation as to a hazardous condition is confined to the sprinkler head's proximity to the sidewalk. R. Doc. 1-2 ¶ V.

10

Cir. 1980)). Contractual choice-of-law provisions are "presumed valid until [they are] proved invalid." *Barnett v. Am. Const. Hoist, Inc.*, 91 So. 3d 345, 349 (La. App. 1 Cir. 2012).

Here, the contract contains a choice-of-law clause providing that New York law shall govern any disputes arising out of the agreement.[28] Neither party addresses choice of law in its briefs. Defendant Chase cites Louisiana contract law,[29] and SMS cites no law at all.[30] Nonetheless, neither party argues that the choice-of-law provision should not be enforced. Because Louisiana choice-of-law principles require the application of "the law expressly chosen . . . by the parties," La. Civ. Code art. 3540, the Court applies New York law to the dispute.

Under New York law, the scope of an indemnification provision "must be determined based on the wording of the specific agreement." *Luna v. Am. Airlines*, 769 F. Supp. 2d 231, 240-41 (S.D.N.Y. 2011) (citing *Hooper Assocs. v. AGS Computs.*, 548 N.E.2d 903, 905 (N.Y. 1989)). Courts enforce indemnity provisions only when the contractual language expresses an "unmistakable intention" to indemnify. *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 378 (S.D.N.Y. 2019) (quoting *Haynes v.*

---

[28] R. Doc. 55-2 at 22.
[29] *See* R. Doc. 46-1 at 4-5.
[30] *See* R. Doc. 55.

11

*Kleinewefers & Lembo Corp.*, 921 F.2d 453, 456 (2d Cir. 1990)) (applying New York law); *see also Heimbach v. Metropolitan Transp. Auth.*, 553 N.E.2d 242, 246 (N.Y. 1990) (applying the "unmistakable intention" standard). A contract assuming the obligation to indemnify "must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed." *Hooper*, 548 N.E.2d at 905 (citations omitted). "[A]n indemnity provision should be construed so as to encompass only that loss and damage which reasonably appear to have been within the intent of the parties." *CVS Pharmacy*, 377 F. Supp. 3d at 378 (quoting *Niagara Frontier Transp. Auth. v. Tri-Delta Const. Corp.*, 487 N.Y.S.2d 428 (App. Div.), *aff'd*, 484 N.E.2d 1047 (1985)). The meaning of an indemnity provision "should not be extended to include damages which are neither expressly within its terms nor of such character that it is reasonable to infer that they were intended to be covered under the contract." *Id.* The party seeking indemnification bears the burden to demonstrate the parties' intent to indemnify. *U.S. Bank, Nat'l Ass'n v. Citigroup Global Mkts. Realty Corp.*, No. 13-6989, 2015 WL 1222075, at *6 (S.D.N.Y. Mar. 13, 2015) (citing *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 415 (S.D.N.Y. 2011)).

12

Here, the indemnification clause provides that SMS will defend and indemnify Chase and CBRE from and against any liabilities or costs "arising out of or in connection with" SMS's "work on the Facilities or other work site."[31] The only condition that plaintiff alleges to have been hazardous is the physical placement of the sprinkler head.[32] The question, therefore, is whether a claim based on the location of a sprinkler head triggers SMS's indemnity obligations under the terms of the contract. To that end, the Court must determine whether physical placement of a sprinkler head is within the scope of SMS's "work on the Facilities."

The contract does not define the term "work on the Facilities." It does, however, define the term "Services" as those "described in Exhibits 1-A through 1-C . . . and in individual work orders, if any, issued by CBRE in writing."[33] Exhibit 1-B includes various irrigation services. But none of the listed services include the placement or movement of sprinkler heads. The services' only references to sprinkler heads are those providing that SMS will "adjust and clean all heads and valves" as part of a periodic "Irrigation Start Up,"[34] and that it will "clean and adjust all heads, . . . and report any broken

---

[31] R. Doc. 55-2 at 17.
[32] R. Doc. 1-2 ¶ V.
[33] R. Doc. 55-2 at 33.
[34] *Id.* at 58.

13

or damaged heads" as part of a periodic "Irrigation Audit." Neither of these services contemplates that SMS will change or otherwise determine the physical location of sprinkler heads.

To be sure, Exhibit 1-B elsewhere indicates that SMS may complete "[i]rrigation system conversions or modifications" on the premises.[35] This systemwide service might fathomably include the movement and placement of sprinkler heads. But this service is offered under "Additional Landscaping Services," which are, by express provision, "not included as part of the Core Services."[36] Instead of providing those services on a periodic or predetermined basis, SMS provides them only "upon CBRE's request (as reflected in [a] . . . Work Order[]) and [SMS's] acceptance thereof."[37]

Accordingly, an "Additional Landscaping Service[]" may become part of SMS's "work on the Facilities" if requested and completed pursuant to a written Work Order. SMS has submitted authenticated evidence indicating that sprinkler location amounts to an "Additional Landscaping Service[]," requiring a Work Order to become part of SMS's work on the Facilities.[38]

---

[35] *Id.* at 67.
[36] *Id.* at 65.
[37] *Id.*
[38] *See id.* at 110.

SMS's evidence states that it has located no Work Orders for any such services.[39] Chase has submitted no evidence to the contrary.

Because the operative contract does not include sprinkler-head placement among SMS's Core Services, and because nothing in the record suggests that sprinkler-head placement otherwise falls within the purview of SMS's "work on the Facilities," the Court finds that the language of the indemnification provision does not express an "unmistakable intention" that SMS would indemnify Chase and CBRE for claims such as plaintiff's.

As discussed, the foregoing analysis relies on the contract as amended in 2017. The Court's findings based on the effective contract are grounds enough to deny Chase's motion. Nonetheless, the Court notes that, even if the old contract submitted by Chase[40] were the operative agreement, Chase points to no provision nor Work Order under that contract suggesting that SMS ever installed, moved, or was otherwise responsible for the placement of any sprinkler heads. Indeed, the old contract contemplates that the existence and design of an irrigation system is outside the scope of SMS's work.[41] In sum, the Court's review of the obsolete contract reveals no

---

[39] *Id.*
[40] R. Doc. 46-3 at 10.
[41] *See, e.g., id.* at 38 ("Watering shall be performed manually if no irrigation system exist[s]."); *id.* (addressing the "maintenance of any existing irrigation systems").

15

indemnification obligation for a claim based on the placement of a sprinkler head.

Accordingly, Chase is not entitled to summary judgment on its third-party claim that SMS must indemnify Chase and CBRE as to plaintiff's claims.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Chase's motion for summary judgment.

New Orleans, Louisiana, this __29th__ day of July, 2021.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE